# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |
|---|---|
| CENTRAL STATES, SOUTHEAST & SOUTHWEST AREAS PENSION FUND et al, <br><br> Plaintiffs, <br><br> v. <br><br> JOHN CLARK TRUCKING & RIGGING COMPANY f/k/a/ THE JOHN CLARK TRUCKING COMPANY et al., <br><br> Defendants. | Case No. 05 C 0948 <br><br> Judge Joan B. Gottschall |

## MEMORANDUM OPINION & ORDER

Plaintiffs Central States, Southeast and Southwest Areas Pension Fund, Central States, Southeast and Southwest Areas Health and Welfare Fund, and trustee, Howard McDougall (collectively "the Fund") have brought suit pursuant to Section 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1145, against Defendants John Clark Trucking & Rigging Company ("Clark Trucking"); Hosea Industrial Packing, LLC ("Hosea-Industrial Packing"); Hosea Industrial Warehousing & Packing, LLC ("Hosea-Warehousing"); Hosea Worldwide, Inc. ("Hosea-Worldwide"); Hosea Office & Industrial Services, Inc. ("Hosea-Office"); Hosea Packing & Shipping, Inc. ("Hosea-Packing&Shipping"); Hosea Project Movers, LLC ("Hosea-Project"); Hosea-Hensley Trucking & Rigging Co., Inc. ("Hosea-Hensley"); Southern Project Movers, LLC ("SPM"); and Todd Transportation Company ("TTC"). The amended complaint contains five counts. Count I seeks delinquent contributions from Clark Trucking for an employee whom Clark Trucking reported to the Fund, but for whom Clark Trucking allegedly failed

to pay the required contribution in 2004.[1] Count II alleges that Clark Trucking utilized employees who worked for the other defendants and who were not reported to the Fund (collectively, "unreported employees") for jobs that should have been reserved for employees who are reported to the Fund (collectively, "reported employees"). This count alleges that Clark Trucking is contractually obligated to pay contributions for these unreported employees under a Collective Bargaining Agreement ("CBA") between Clark Trucking and a local union, Local Union No. 100 ("Local 100"). Count III alleges that the remaining defendants constitute a "single employer" with Clark Trucking, and are liable for any unpaid contributions for employees who engaged in work covered by the CBA from 1998 to 2006. Count IV alleges that the remaining defendants constitute the "alter ego" of Clark Trucking, and are liable for any unpaid contributions for employees who engaged in work covered by the CBA from 1998 to 2006. Count V alleges that the remaining defendants constitute "joint employers" with Clark Trucking, and are liable for any unpaid contributions for employees who engaged in work covered by the CBA from 1998 to 2006. Pending before the court are cross-motions for summary judgment[2] and a related motion to strike.

---

[1] Though Count I is silent on this point, the Fund's briefs indicate that this is in regard to contributions for one employee, David Kirchner.

[2] Defendants have moved on all counts, but make no arguments as to Count II. Plaintiffs do not specify on which counts they move, and raise no arguments as to Counts II and V. Because neither side has addressed Count II, it will not be considered.

Count V involves joint-employer liability, and Count III involves single-employer liability. These theories are related, but joint-employer liability does not require common ownership. *See Esmark, Inc. v. N.L.R.B.*, 887 F.2d 739, 754 (7th Cir. 1989). As described below, the issue of common ownership is contested only as to one defendant, SPM, and therefore the distinction between joint- and single-employer liability is immaterial for other defendants and will not be considered. Nor is this distinction relevant to the court's final conclusion regarding defendant SPM.

# I. BACKGROUND[3]

## A. The Defendant Entities

Clark Trucking, which was owned by Jack Clark prior to its purchase by David Hosea in the 1980s, was primarily engaged in the business of rigging, dismantling, and hauling large equipment. David Hosea operated several different corporations prior to and after his purchase of Clark Trucking, some of which engaged in work similar to that performed by Clark Trucking and others of which focused on related packing and shipping functions. The following is a brief chronological description of the various defendant entities.

Prior to the purchase of Clark Trucking, David Hosea operated Hosea-Worldwide for work largely related to moving heavy machinery and plant relocation, as well as packing and shipping. It appears that TTC was also operating at this point, primarily providing the service of over-the-road transportation of heavy machinery and other large items. Around 1990, David Hosea purchased Hosea-Hensley to expand Hosea-Worldwide's ability to utilize cranes in its work.

In 1992, the Hosea entities underwent their first major transformation. Hosea-Worldwide's packing and shipping work was transferred to a new company, Hosea-Packing & Shipping. Hosea-Worldwide's heavy machinery moving and plant relocation work, and related relocation services, was transferred to the new entity Hosea-Office. By 1995 or 1996, Hosea-Hensley and TTC had ceased operations. The employees of Hosea-Hensley and TTC were largely absorbed into the existing companies.

---

[3] These facts are derived from the parties' statements of facts filed pursuant to Local Rule 56.1. Unless otherwise indicated, the facts included herein are undisputed. At the summary judgment stage, the court is only to consider facts that are supported by evidence that would be admissible at trial. *Scott v. Edinburg*, 346 F.3d 752, 759–60 & n.7 (7th Cir. 2003). To the extent that facts are considered herein, they are deemed to be admissible.

A second restructuring occurred in the late 1990s. Hosea-Packing & Shipping ceased operations in 1998, and its work was split between two new companies: Hosea-Industrial Packing and Hosea-Warehousing. In 2000, Hosea-Project was formed, and Hosea-Office's work was merged into Hosea-Project in the early 2000s. Around this same time, Clark Trucking ceased operations,[4] and its remaining reported employees were absorbed into other defendant entities. By 2002, Hosea-Worldwide had also transferred its remaining work to Hosea-Project, and Hosea-Worldwide became a holding/leasing company, leasing its equipment to Hosea-Project.

In 2003 or 2004, the new company SPM was formed. Unlike all of the prior entities described herein, David Hosea did not own SPM. Instead, SPM was formed in part by David Hosea's mother, Marcia Hosea. SPM was created to work on an anticipated transportation contract for a car manufacturing facility. This contract did not come to fruition, and SPM shut down shortly after being formed.

**B.     Clark Trucking, Local 100, and Union Representation**

Clark Trucking is the only entity owned by David Hosea that employed union labor, and there is no allegation that the other Hosea entities entered into any relevant CBAs. Prior to and continuing after David Hosea's purchase, Clark Trucking was a party to a series of CBAs with Local 100. The particular CBA that was in effect from 1998 onward was to cover the following employees:

> all leadmen (pushers), heavy machinery mover handler drivers, mule and fork lift operators, and helpers employed by the Employer directly, or indirectly, or in any wholly owned or controlled subsidiary company of the Employer, who was engaged in construction work, demolition, hauling materials or machinery for construction or used in construction or demolition.

---

[4] Clark Trucking's precise date of cessation of operations is not in the record.

*See* Am. Compl. ¶ 21 (quoting CBA art. I, sec. 2). The CBA requires Clark Trucking to submit contributions on behalf of covered employees to both the plaintiff pension fund and plaintiff health and welfare fund.

**C.     The Functioning and Interconnected Nature of the Entities**

David Hosea purchased Clark Trucking to take advantage of the expertise of Clark Trucking's employees, and to expand the business opportunities for his other corporations by gaining access to Clark Trucking's customer list and by gaining the ability to compete for union-only contracts. At the time of purchase, David Hosea promised Jack Clark that all of the existing unionized employees working for Clark Trucking (and who were being reported to the Fund) would continue to work for him until they had retired—none would be laid off. David Hosea appears to have fulfilled this promise.

David Hosea was the president of every defendant, with the exception of SPM. Although the various defendants maintained distinct corporate identities, much of their day-to-day work was interconnected. Shortly after Clark Trucking was acquired, David Hosea began employing integrated working crews that crossed corporate lines. Staffing for particular jobs was done based on the employee's relevant skill set. Reported and unreported employees would work side by side, and reported employees would train unreported employees. Mechanics from different payrolls worked on all of the defendants' equipment without regard to which company owned it. All defendants shared the same corporate counsel and accountant,[5] and all defendants' insurance policies

---

[5] Defendants dispute this, but cite only to testimony regarding the fact that Hosea-Worldwide has its taxes prepared by C.R. Sutherland (because Hosea-Worldwide is a C-Corporation that must be reported on David Hosea's return, and C.R. Sutherland prepares David Hosea's taxes) while the remaining Defendants have their taxes prepared by Deloitte & Touche. *See* Defs.' Resp. to Pls.' L.R. 56.1(a)(3) Stmt. of Material Facts ¶ 98 (Doc. No. 121). To the extent that "tax preparer" is the same as "accountant," this fact is in dispute. In all other respects, it is admitted.

5

were maintained by the same company. Defendants shared the same phone and fax numbers in their business operations, though the parties dispute whether the same receptionist was shared by the companies. Some defendants operated from the same premises, though a few were located away from the main office. All administrative functions, including payroll, human resources, and accounts receivable and payable, were handled for all defendants by the same individuals. Labor relations were also centralized across the companies. Kim McKenney f/k/a/ Kim Kraemer was responsible for hiring, firing, disciplining, and dispatching all defendants' employees, both reported and unreported, from 1990 to present. David Hosea was involved in the formation of the last CBA between the Local 100 and Clark Trucking.

Some matters were kept distinct, at least as between Clark Trucking and the other defendants.[6] All employees other than the reported employees had access to a corporate-sponsored 401(k) plan. Each entity maintained separate bank accounts, and many of the shared costs (such as utilities for those that shared common premises) were divided among the entities. Also, prior to Clark Trucking's cessation of operations in 2000, the parties agree that Clark Trucking's day-to-day operations—including bidding jobs, dispatching crews, and general management of the company—were handled by first Ray Doran and later Bob Clark; Ray Doran and Bob Clark served as managers for Clark Trucking. There is no allegation that Ray Doran or Bob Clark were involved in the other defendants' operations.[7]

---

[6] Because Clark Trucking is the only defendant who signed a CBA, the inquiry into single-employer status only matters for each defendant in relation to Clark Trucking; the relationship of the defendants to each other to the exclusion of Clark Trucking is immaterial.

[7] Both parties admit the aforementioned facts, notwithstanding the seeming contradiction between the contention that Ray Doran and Bob Clark handled nearly every aspect of Clark Trucking's operation—especially dispatching crews and general management—and the contention that (1) the crews were integrated with reported and unreported employees working together during this time period, and (2) McKenney was responsible for hiring, firing, disciplining, and dispatching

6

**D.      Decline in the Number of Clark Trucking's Reported Employees**

Over time, the number of Clark Trucking's reported employees declined until 2007 when there was only one reported employee remaining. During the entire time that David Hosea owned and operated Clark Trucking, no new unionized employees were hired. During this same period, the number of unreported employees increased. The parties offer differing explanations for this. The Fund alleges that David Hosea had concerns over the rising costs of labor and contributions, as well as objections to the seniority system the CBA required, and was intentionally attempting to avoid unionized labor that he perceived to be more expensive. Defendants respond that the need for unionized labor had decreased, the reported employees declined to work on jobs that would take them far from Cincinnati (which they had the right to do), and Bob Clark's failing health led to a diminution in Clark Trucking's customer lists.

Although Clark Trucking ceased operations in 2000, all remaining reported employees began working for other defendants after 2000. At this point, Clark Trucking had no revenue itself. However, the Fund was never informed that the reported employees were now working for different entities. To the contrary, defendants continued to make contributions on behalf of the reported employees through the Clark Trucking account by transferring money to Clark Trucking from the other entities. David Hosea even attempted to negotiate a new CBA on behalf of Clark Trucking with the Local 100 in 2003, despite the fact that Clark Trucking was no longer operating.[8]

---

*all* defendants' employees, both reported and unreported, from 1990 to present.

[8] The 2003 proposed CBA did not garner sufficient support from the remaining reported employees. Because a new CBA was not entered into but the old CBA was not dissolved, the old CBA remained in effect on a year-to-year basis.

**E.     Facts Specific to Count I:  Delinquent Reporting of Employee Termination Date**

As each reported employee retired, Clark Trucking generally notified the Fund of the same. Under the CBA, Clark Trucking was required to notify the Fund of a reported employee's change in employment status by the 15th of the month following the month the change occurred; failure to do so would result in the Fund billing Clark Trucking for the previous month.  In one instance, Clark Trucking failed to report to the Fund that employee David Kirchner was terminated on May 18, 2004 until sometime in or around until November, 2004.  Clark Trucking failed to pay contributions for Kirchner during this period.

## II. ANALYSIS

Summary judgment is warranted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005).  All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party.  *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008).  This same approach is appropriate for cross-motions.  *Bassiouni v. F.B.I.*, 436 F.3d 712, 721 (7th Cir. 2006).

**A.     Count I:  Delinquent Contributions for Reported Employee Kirchner**

In Count I the Fund alleges that Clark Trucking was delinquent in notifying the Fund that employee Kirchner, who both sides agree was covered by the CBA, was terminated.  The Fund seeks summary judgment as to Clark Trucking's liability for delinquent payments for this specific employee.  Defendants have raised no legal arguments nor contested any facts related to Count I regarding Clark Trucking's liability.  Summary judgment in favor of the Fund against Clark Trucking is entered on Count I.

**B.      Count III:  Single Employer Status[9]**

"The single employer doctrine holds that when two entities are sufficiently integrated, they will be treated as a single entity for certain purposes." *Moriarty v. Svec*, 164 F.3d 323, 332 (7th Cir. 1998) (citation omitted).  A variety of factors can be considered, the most common including the interrelation of operations between the entities, whether there is common management between the entities, whether there is centralized control of the entities' labor relations, and whether there is common ownership.  *Id.*  "No one of these factors is conclusive; instead, the decisionmaker must weigh the totality of the circumstances." *Tr. of Pension, Welfare and Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co., Inc.*, 995 F.2d 785, 788 (7th Cir. 1993) (citation omitted).  Assuming that two entities are found to be a single employer, then a CBA entered into by one entity will apply to the other entity, and contributions from both can be required, to the extent that the CBA's definition reaches the employees of the other entity.  *Id.*

   1.      Defendants Hosea-Hensley and TTC

The Fund is seeking contributions from January 1, 1998, to February 28, 2006.  Both parties agree that Defendants Hosea-Hensley and TTC ended their operation in 1995 or 1996, with their employees being transferred to other enterprises owned by David Hosea.  Summary judgment is entered in favor of Hosea-Hensley and TTC as to Counts III, IV, and V since it is not possible that Clark Trucking and Hosea-Hensley or Clark Trucking and TTC were part of an interrelated entity from 1998 onward.

---

[9] The Fund requests that the court disregard the facts cited by defendants in response to the Fund's motion for summary judgment because defendants failed to proffer a statement of *additional* facts, relying instead on the statement of facts they attached to their cross-motion for summary judgment.  *See* Reply Mem. in Supp. of Central States' Mot. for Summ. J. 2 (Doc. No. 129).  The Fund's request to disregard is denied.

2. Defendants Hosea-Industrial Packing, Hosea-Warehousing, Hosea-Worldwide, Hosea-Office, Hosea-Packing & Shipping, and Hosea-Project, and SPM

There are several relevant factors that suggest that the remaining defendants form a single entity with Clark Trucking. First, the interrelation of the operations between Clark Trucking and the remaining defendants suggests a finding of single-employer status may be appropriate. David Hosea purchased Clark Trucking both so that he could access union-exclusive customers, and so that he could have the Clark Trucking employees train his other employees. Sometime in the 1990s— shortly after Clark Trucking was acquired by David Hosea—the working crews of *all* defendants were integrated across corporate entities, with reported employees working side-by-side with unreported employees. These factors suggest a significant level of integration among the defendants, and encourage a finding of single employer status. The facts highlighted by defendants—including that utilities were split among the defendants and that only unreported employees were offered a 401(k) program—do not outweigh this other evidence.

Second, the issue of common ownership is largely undisputed—David Hosea had a direct ownership in all of the defendant entities with the exception of SPM, and was president of every defendant organization with the exception of SPM.[10] Again, this supports a finding of single-employer status for all defendants other than SPM.

Third, there was centralized control of all the entities' labor relations. David Hosea was president of all defendants except SPM, and he was involved in the formation of the last CBA between Local 100 and Clark Trucking. The parties agree that McKenney was responsible for hiring, firing, disciplining, and dispatching all defendants' employees, both reported and unreported,

---

[10] SPM is unique from the other defendants to the extent that it was not formed by David Hosea, but by his mother Marcia Hosea. However, at least some of the reported employees who formerly worked for Clark Trucking did work for SPM during its brief existence in 2003 or 2004.

from 1990 through the date of the filing of this action. Again, this supports a finding of single-employer status.

However, the issue of common management is more complicated. Prior to Clark Trucking's cessation of operations in 2000, its day-to-day operations—including bidding jobs, dispatching crews, and general management of the company—were handled by Ray Doran and Bob Clark. Neither party alleges that Ray Doran or Bob Clark did this for any other defendant. The role of Ray Doran and Bob Clark—though agreed by both sides—is largely incompatible with several other agreed facts in this case, especially the agreement of the parties that the working crews were "integrated" from the 1990s onward (which is incompatible with the notion that Ray Doran and Bob Clark dispatched all the Clark Trucking employees, but did not do so for other defendant employees), and that McKenney handled all hiring, firing, discipline, and dispatching (which is directly contradicted by the admitted fact that Doran and Bob Clark handled dispatching and general management of Clark Trucking). Though the parties' paper filings do not suggest that these facts are in dispute, the court cannot agree.

The management of Clark Trucking prior to its cessation of operations is highly material to the issue of single-employer status, especially in this case where it speaks to the amount of interoperability between the various reported and unreported employees. *See, e.g.*, *Cent. States, Se., Sw. Areas Pension Fund v. George W. Burnett, Inc.*, 451 F. Supp. 2d 969, 976 (N.D. Ill. 2006) (emphasizing the interconnectedness of defendants). However, this one factual dispute is only at issue for the period from 1998 to the time Clark Trucking ceased operations in 2000; after this point, it is undisputed that all the remaining reported employees, who are covered by the CBA, were working for the other defendants. Even when all inferences from these facts are drawn in the light

most favorable to the remaining defendants, the unavoidable conclusion is that they were acting as a single employer *after* Clark Trucking ceased operations in 2000.

Summary judgment on Count III is granted on behalf of the Fund for the period after Clark Trucking ceased operations to February 28, 2006. Prior to that date, both parties' motions for summary judgment are denied because there is a material fact in dispute.

**C.   Count IV:  Alter Ego**

The inquiry into alter-ego status "focuses on the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets." *Int'l Union of Operating Eng'rs, Local 150 v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir. 1987) (quotations omitted). "[U]nlawful motive or intent are critical inquiries in an alter ego analysis." *Id.* (quotations omitted); *see also Cent. States, Se., Sw. Areas Pension Fund v. Cent. Transport, Inc.*, 85 F.3d 1282, 1288 (7th Cir. 1996); *Burnett*, 451 F. Supp. 2d at 977 n.3. As the Seventh Circuit made clear in *Central Transport*, although "the underlying congressional policy behind ERISA favors the disregard of the corporate entity in cases where *employees* are denied their pension benefits," there is no such policy interest in cases such as this where "a multiemployer pension fund[] attempt[s] to collect a share of unpaid contributions," and "[t]he requirement of showing some fraudulent intent on the part of [the defendants] applies here." *Id.* (citations omitted) (emphasis added).

There is a material dispute as to the intent of David Hosea. On the one hand, defendants argue that Hosea had the best of intentions, that he acquired Clark Trucking precisely so that he could obtain contracts exclusive to union labor, that he promised former Clark Trucking ownership that he would keep all union members working until they had retired, and that when Clark Trucking's union business dried up, David Hosea found additional work for the Clark Trucking

12

union employees (working non-union jobs) until they retired. Indeed, it is not disputed that David Hosea continued to pay the contributions for these union employees even though they were no longer working for Clark Trucking, having been shifted to the payrolls of the other companies. On the other hand, the Fund points to evidence that David Hosea was concerned about the higher costs of union employees and that he opposed the seniority system, suggesting that he might have a motive to attempt to avoid the CBA obligations. Though the Fund does not specifically rely on this, it is also worth noting that David Hosea never disclosed to the Fund that Clark Trucking was no longer functioning, and David Hosea attempted to negotiate a new CBA in 2003 without disclosing that the employees who were to be covered no longer earned a paycheck from Clark Trucking. The issue of intent is material and disputed. Both parties' motions for summary judgment on this issue are denied.

**D.     Defendants' Affirmative Defenses**

Defendants raise a number of affirmative defenses which they argue entitle them to summary judgment regardless of the underlying merits of the alter ego and single-employer claims. These will be briefly considered in turn.

   1.      Contractual Exhaustion / Arbitration

Defendants first point to the CBA signed by Clark Trucking, and specifically to arbitration provisions found in Article 20 (as to disputes concerning the requirement to make contributions to the Health and Welfare Fund) and Article 21 (as to the Pension Fund).[11] These provisions permit

---

[11] The text of Article 21 referring to arbitration appears limited to the employer's obligation to notify the union if a probationary employee is terminated, and the requirements to continue paying contributions if no such notice is provided. *See* CBA art. 21 at 16 (attached to Defs.' L. R. 56.1(a)(3) Stmt. of Uncontested Facts at Ex. I (Doc. No. 101-8)). Article 20 does not have such a limitation, providing instead that "Disputes or questions of interpretation concerning the requirement to make contributions on behalf of particular employees or classifications of employees shall be submitted directly to the Conference Joint Area Committee by either the Employer, the Local Union,

13

arbitration of various disputes, and employ the word "shall," which would normally suggest a mandatory obligation. However, the Seventh Circuit has held to the contrary, noting that an arbitration agreement with such language merely "gives either party the choice of an alternative, nonjudicial forum in which to seek a resolution of a dispute arising out of the contract." *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 390 (7th Cir. 1995). Failure to select arbitration promptly can result in waiver. *Id.* Whether waiver has occurred is decided by looking at the particulars of each case. *Id.* at 390–91. In this case, defendants raised the issue of exhaustion as an affirmative defense, but they have litigated the case for years without seeking arbitration. Even now they do not seek arbitration, but rather termination for failure to exhaust.

Arbitration is an *alternative* forum, but it is not a forum that needs to be exhausted prior to filing the instant suit. If a party wishes to arbitrate, it must make that intention clear from the beginning, not wait until the case has progressed for three years and dispositive motions have been filed. *See id.* at 391 ("Selection of a forum in which to resolve a legal dispute should be made at the earliest possible opportunity in order to economize on the resources, both public and private, consumed in dispute resolution."). Having failed to exercise this right at a reasonable point in this litigation, defendants have waived their right to arbitration. This affirmative defense fails as a matter of law.

    2.    Laches

Defendants separately argue that the Fund's claims should be barred by the equitable doctrine of laches, which in law means a "culpable delay in suing." *Teamsters & Employers Welfare Trust of Ill. v. Gorman Bros. Ready Mix*, 283 F.3d 877, 880 (7th Cir. 2002). "Laches cuts

---

or the Trustees." *Id.* art. 20 at 14.

off the right to sue when the plaintiff has delayed 'too long' in suing. 'Too long' for this purpose means that the plaintiff delayed inexcusably and the defendant was harmed by the delay." *Id.*

The Fund is seeking contributions from January 1, 1998 forward. *See* Am. Compl. ¶ 57. The Fund delayed suing for at most eight years, within the ten-year statute of limitations. Laches can still apply in this situation, but only where "a plaintiff does something that reasonably induces the defendant to believe he won't be sued and the defendant's ability to defend himself against the plaintiff's suit is impaired as a result." *Gorman*, 283 F.3d at 882.

Defendants argue that they have been prejudiced by the Fund's delay in prosecuting this case, but they do not make any argument that the prejudice was induced by the Fund. *Gorman* requires some sort of affirmative conduct by the Fund, not mere inaction (*i.e.*, not suing). Because defendants have offered no proof of reliance, this affirmative defense fails as a matter of law.[12]

### 3. Fraud in the Execution

Defendants next argue that the CBA was induced by fraud in the execution. Fraud in the execution of a contract "entails deceiving a party to an agreement as to the very nature of the instrument it signs so that the party 'actually does not know what he is signing, or does not intend to enter into a contract at all.'" *Laborers' Pension Fund v. A & C Env'l Inc.*, 301 F.3d 768, 779 (7th Cir. 2002) (citation omitted). In contrast, "'Fraud in the inducement' occurs when fraud induces a party to assent to a commitment that the party understands but to which the party would not otherwise have assented; the promisor knows what it is signing but its assent is induced by fraud."

---

[12] The Fund has moved to strike references made in Defendants' Reply in Support of their Motion for Summary Judgment regarding communications between Defendants and Local 100 in Las Vegas, which Defendants allege establish that the Fund had notice of the claims in this suit since at least 1990. *See* Mot. to Strike (Doc. No. 139); Defs.' Reply in Supp. of Mot. for Summ. J. at 8 (Doc. No. 128). Even if the Fund had notice, that is not sufficient to constitute laches. The Fund's motion to strike is denied as moot.

*Id.* Fraud in the inducement claims are foreclosed by ERISA, but fraud in the execution claims are not. *Id.*

Defendants argue that when the CBA at issue in this case was signed by David Hosea, as representative of Clark Trucking, he understood that it was a CBA, but further understood (and allegedly relied on representations from a Union representative) that it would be limited to the current Clark Trucking reported employees. Defendants assert that the CBA was executed as a result of fraud in the execution because David Hosea did not understand that he was entering into a CBA that would reach the other defendants.

Defendants' argument is without merit. David Hosea was under no misunderstanding that the document was a CBA, nor did he misunderstand the type of work covered by the CBA. David Hosea *possibly* misunderstood the legal significance of how he structured the various entities that he owned and operated, but that is insufficient for a fraud in the execution claim. For example, the *A & C Environmental* case discusses *Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501 (9th Cir. 1984), where fraud in the execution was found because the signer thought he was signing a union membership form, not a CBA. *A & C Env'l*, 301 F.3d at 780–81. In contrast, the Seventh Circuit found in *A & C Environmental* that an employer who fills out a document with the caption "COLLECTIVE BARGAINING AGREEMENT," and who thought that the CBA would be limited to a few employees only, when in fact it reached the entire corporate operation, was not entitled to a fraud in the execution defense. *Id.* at 781. The defendants' argument is similar to that rejected in *A & C Environmental*—if there was any misunderstanding, it was as to the scope of the agreement, not to the existence of an agreement. This affirmative defense fails as a matter of law.

#### 4. Manifest Unfairness / Windfall

Defendants argue that permitting recovery to the Funds will result in a windfall since (1) at least part of the contributions are for health care coverage, but unreported employees had other health care coverage provided to them in the past, and/or purchased their own insurance; (2) the unreported employees who worked for entities other than Clark Trucking were permitted to participate in a 401(k) program that would provide benefits after retirement; and (3) some of the contributions would be for employees who would not have accrued sufficient pension credit to actually gain any "benefit" from the Fund. Because Defendants failed to raise this affirmative defense in their amended answer (Doc. No. 23), it is waived. *Castro v. Chi. Hous. Auth.*, 360 F.3d 721, 735 (7th Cir. 2004) ("[Rule 8(c) requires that defendants raise all affirmative defenses that will defeat the allegations in the complaint in a responsive pleading. We have stated numerous times that if a defendant does not raise defenses at the time of filing an answer, those defenses are deemed waived.").

### III. CONCLUSION

Defendants Hosea-Hensley and TTC are granted summary judgment on Counts III, IV, and V. Plaintiffs are granted summary judgment on Count I, and on Count III for the period from the date Clark Trucking ceased operations in 2000 until February 28, 2006. Summary judgment is denied to both parties on all remaining counts, and as to Count III for the time period of January 1, 1998, to the date Clark Trucking ceased operations in 2000. Plaintiffs' motion to strike facts initially alleged in Defendants' summary judgment reply brief is denied as moot.

ENTER:

       /s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: March 19, 2009